**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>v.<br><br>SINCLAIR BROADCAST GROUP, INC.,<br>RAYCOM MEDIA, INC.,<br>TRIBUNE MEDIA COMPANY,<br>MEREDITH CORPORATION,<br>GRIFFIN COMMUNICATIONS, LLC,<br>and<br>DREAMCATCHER BROADCASTING, LLC,<br><br>*Defendants*. | Case No. 1:18-cv-2609 |

**COMPETITIVE IMPACT STATEMENT**

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), files this Competitive Impact Statement relating to the proposed Final Judgments against Defendants Sinclair Broadcast Group, Inc. ("Sinclair"), Raycom Media, Inc. ("Raycom"), Tribune Media Company ("Tribune"), Meredith Corporation ("Meredith"), Griffin Communications, LLC ("Griffin"), and Dreamcatcher Broadcasting, LLC ("Dreamcatcher") (collectively, "Defendants"), submitted for entry in this civil antitrust proceeding.

**I.     Nature and Purpose of the Proceeding**

On November 13, 2018, the United States filed a civil antitrust complaint alleging that Defendants agreed among themselves and other broadcast television stations in many local

markets to reciprocally exchange station-specific, competitively sensitive information regarding spot advertising revenues. The Complaint alleges Defendants' agreements are unreasonable restraints of trade that are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Complaint seeks injunctive relief to prevent Defendants from exchanging competitively sensitive information with and among competing broadcast television stations.

Along with the Complaint, the United States filed proposed Final Judgments for each of the Defendants. The proposed Final Judgments are substantively the same for all Defendants. The proposed Final Judgments prohibit sharing of competitively sensitive information, require Defendants to implement antitrust compliance training programs, and impose cooperation and reporting requirements.

The United States and Defendants have stipulated that the proposed Final Judgments may be entered after compliance with the APPA, unless the United States withdraws its consent. Entry of the proposed Final Judgments would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgments and to punish violations thereof.

## II.     Description of the Events Giving Rise to the Alleged Violation

### A. Industry Background

Broadcast television stations sell advertising time to businesses that want to advertise their products to television viewers. Broadcast television "spot" advertising,[1] which typically

---

[1] Spot advertising differs from other types of television advertising, such as network and syndicated television advertising, which are sold by television networks and producers of syndicated programs on a nationwide basis and broadcast in every market where the network or syndicated program is aired.

comprises the majority of a station's revenues, is sold directly by the station itself or through its sales representatives to advertisers who want to target viewers in specific geographic areas called Designated Market Areas ("DMAs").[2]

Broadcast stations typically make their spot advertising sales through two channels: (1) local sales, which are sales made by the station's own local sales staff to advertisers who are usually located within the DMA; and (2) national sales, which are sales made either by the broadcast group's national sales staff or by a national sales representative firm ("Sales Rep Firm") to regional or national advertisers.

Defendants own or operate multiple broadcast television stations, as set forth in the following table:

| **Defendant** | **Stations** | **DMAs** |
|---|---|---|
| Sinclair | 130 | 87 |
| Raycom | 55 | 43 |
| Tribune | 41 | 31 |
| Meredith | 17 | 12 |
| Griffin | 4 | 2 |
| Dreamcatcher | 3 | 2 |

Defendants, along with certain other television broadcast station groups, compete in various configurations in multiple DMAs across the United States. Each Defendant sells spot advertising time to advertisers that seek to target viewers in the DMAs in which Defendants

---

[2] A DMA is a geographical unit designated by the A.C. Nielsen Company, a company that surveys television viewers and furnishes data to aid in evaluating television audiences. There are 210 DMAs in the United States. DMAs are widely accepted by television stations, advertisers, and advertising agencies as the standard geographic area to use in evaluating television audience size and demographic composition.

operate. Prices are individually negotiated with advertisers, and advertisers are able to "play off" the stations against each other to obtain competitive rates.

There are two primary Sales Rep Firms in the United States today, and each represents hundreds of television stations throughout the country in the sale of national advertising time. It is common for one Sales Rep Firm to represent multiple competing stations in the same DMA. In such cases, the stations and the Sales Rep Firms purportedly create firewalls to prevent coordination and information sharing between the sales teams representing competing stations.

B. <u>The Exchanges of Competitively Sensitive Information</u>

The Complaint alleges that Defendants and other broadcasters have agreed in many DMAs to reciprocally exchange station-specific revenue pacing data. Revenue pacing data compares a station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year, indicating how each station is performing versus the rest of the market and providing insight into each station's remaining spot advertising inventory for the current period or future periods. The exchanges were systematic and typically included non-public pacing data on national revenues, local revenues, or both, depending on the DMA. The Complaint further alleges that certain Defendants engaged in the exchange of other forms of competitively sensitive information relating to spot advertising in certain DMAs.

The Complaint alleges that the Defendants exchanged pacing information in at least two ways. First, Defendants and other television broadcast stations exchanged information through the Sales Rep Firms. The information was passed both within and between Sales Rep Firms representing competing stations, and was done with Defendants' knowledge and frequently at

Defendants' instruction.  Second, in some DMAs, Defendants and other broadcasters exchanged pacing information directly between local station employees.

The Complaint alleges that these exchanges of pacing information allowed stations to better understand, in real time, the availability of inventory on competitors' stations, which is often a key factor affecting negotiations with buyers over spot advertising prices.  The exchanges also helped stations to anticipate whether competitors were likely to raise, maintain, or lower spot advertising prices.  Understanding competitors' pacing can help stations gauge competitors' and advertisers' negotiation strategies, inform their own pricing strategies, and help them resist more effectively advertisers' attempts to obtain lower prices by playing stations off of one another.  Defendants' information exchanges therefore distorted the normal price-setting mechanism in the spot advertising market and harmed the competitive process within the affected DMAs.

### III.     Explanation of the Proposed Final Judgments

The provisions of the proposed Final Judgments closely track the relief sought in the Complaint and are intended to provide prompt, certain, and effective remedies that will ensure that Defendants and their employees and sales representatives will not impede competition by sharing competitively sensitive information, directly or indirectly, including through Sales Rep Firms, with their rival broadcast television stations.  The requirements and prohibitions in the proposed Final Judgments will terminate Defendants' illegal conduct, prevent recurrence of the same or similar conduct, ensure that Defendants establish an antitrust compliance program, and provide the United States with cooperation in its ongoing investigation.  The proposed Final

Judgments protect competition and consumers by putting a stop to the anticompetitive information sharing alleged in the Complaint.

### A. Prohibited Conduct

The proposed Final Judgments broadly prohibit Defendants from sharing competitively sensitive information with rival broadcast television stations in the same DMA.[3]  Specifically, Section IV ensures that Defendants will not, directly or indirectly, communicate competitively sensitive information, including pricing or pricing strategies, pacing, holding capacity, revenues, or market shares, to broadcast television stations in the same DMA or to those stations' sales representatives and agents.

The proposed Final Judgment provides that its provisions will apply to stations owned by the settling Defendants even if Defendants sell those stations to new buyers.  In particular, Paragraph IV(C) provides that Defendants may not sell any stations they own as of October 1, 2018, unless the buyer has executed an Acknowledgement that each station will continue to be bound by the terms of the proposed Final Judgment.  The United States, in its discretion, may waive this requirement on a station-by-station basis, or alternatively the buyer and the United States may agree to void the Acknowledgement after the sale has been consummated.

---

[3] As the proposed Final Judgments for each of the Defendants are substantively identical, references to sections throughout this Competitive Impact Statement refer to the same section in each Final Judgment.  The only exception is Section III of the proposed Final Judgment for Defendant Raycom, which has a provision that, in light of the proposed acquisition of Raycom by Gray Television, Inc. ("Gray"), clarifies that the proposed Final Judgment does not apply to stations Gray owned that were not owned by Raycom as of October 1, 2018.

B. Conduct Not Prohibited

Section V makes clear that the proposed Final Judgments do not prohibit Defendants from sharing or receiving competitively sensitive information in certain specified circumstances where the information sharing appears unlikely to cause harm to competition.  Paragraph V(A) allows Defendants to communicate competitively sensitive information to advertising customers or prospective customers.  Paragraph V(B) allows for the communication of competitively sensitive information with other broadcasters (i) for purposes of evaluating or effectuating a transaction, such as the purchase or sale of a station; or (ii) when reasonably necessary for achieving the efficiencies of a legitimate collaboration among competitors, such as a lawful joint venture.[4]  Paragraph V(C) confirms that the proposed Final Judgments do not prohibit petitioning conduct protected by the Noerr-Pennington doctrine.  Paragraph V(D) permits the exchange of competitively sensitive information through certain third-party aggregation services under the conditions listed in that paragraph, including that the aggregated data does not permit individual stations to identify, deduce, or estimate the prices or pacing of their competitors.

C. Antitrust Compliance Obligations

Under Section VI of the proposed Final Judgments, each of the Defendants must designate an Antitrust Compliance Officer who is responsible for implementing training and

---

[4] Paragraph V(B)(5) states that, for purposes of Paragraph V(B) only, certain types of Joint Sales Agreements, Local Marketing Agreements, and similar agreements qualify as a "legitimate competitor collaboration" under Paragraph V(B)(b).  Paragraph V(B)(5) was included in recognition of the fact that some broadcasters have entered into a number of these agreements in various DMAs.  The question of whether these agreements have any effect on competition was outside the scope of the United States' investigation in this matter.  Accordingly, Paragraph V(B)(5) should not be read as an admission that such agreements otherwise comply with the antitrust laws, and the United States takes no position on that question for purposes of this proceeding.

antitrust compliance programs and ensuring compliance with the Final Judgment. Among other duties, the Antitrust Compliance Officer will be required to distribute copies of the Final Judgment and ensure that training on the Final Judgment and the antitrust laws is provided to Defendants' management and sales staff. Section VI also requires Defendants to establish an antitrust whistleblower policy and remedy and report violations of the Final Judgment. Under Paragraph VI(D)(4), each Defendant, through its CEO, General Counsel, or Chief Legal Officer, must certify annual compliance with the Final Judgment. This compliance program is necessary in light of the extensive history of communications among rival stations that facilitated Defendants' agreements.

### D. Defendants' Cooperation

As outlined in Section VII, Defendants must cooperate fully and truthfully with the United States in any investigation or litigation relating to the sharing of competitively sensitive information in the broadcast television industry. The required cooperation may include providing sworn testimony, employee interviews, and/or documents and data.

Paragraph VII(C) provides that, subject to each Defendant's truthful and continuing cooperation as defined in Paragraphs VII(A) and (B), the United States will not bring further civil actions or criminal charges against that Defendant for any agreement to share competitively sensitive information with any other station or Sales Rep Firm when the agreement: (1) was entered into and terminated before the date of the filing of the Complaint and (2) does not constitute or include an agreement to fix prices or divide markets.

E.  <u>Enforcement of Final Judgment</u>

The proposed Final Judgments contain provisions designed to promote compliance and make the enforcement of Division consent decrees as effective as possible. Paragraph X(A) provides that the United States retains and reserves all rights to enforce the provisions of the proposed Final Judgment, including its rights to seek an order of contempt from the Court. Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgments, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that the Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph X(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgments. The proposed Final Judgments were drafted to restore all competition the United States alleged was harmed by Defendants' challenged conduct. The Defendants agree that they will abide by the proposed Final Judgments, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgments that is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face, and as interpreted in light of this procompetitive purpose.

Paragraph X(C) further provides that, should the Court find in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate.

9

In addition, in order to compensate American taxpayers for any costs associated with the investigation and enforcement of violations of a proposed Final Judgment, Paragraph X(C) provides that in any successful effort by the United States to enforce a Final Judgment against a Defendant, whether litigated or resolved before litigation, Defendant agrees to reimburse the United States for any attorneys' fees, experts' fees, or costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Finally, Section XI of the proposed Final Judgments provides that each Final Judgment shall expire seven years from the date of its entry, except that after five years from the date of its entry, the Final Judgments may be terminated upon notice by the United States to the Court and the Defendants that the continuation of the Final Judgments is no longer necessary or in the public interest.

## IV.  Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgments will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgments have no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.  Procedures Available for Modification of the Proposed Final Judgments

The United States and Defendants have stipulated that the Court may enter the proposed Final Judgments after compliance with the provisions of the APPA, provided that the United

States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgments are in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgments within which any person may submit to the United States written comments regarding the proposed Final Judgments. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgments at any time before the Court's entry of judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's website and, under certain circumstances, published in the Federal Register.

Written comments should be submitted to:

> Owen M. Kendler
> Chief, Media, Entertainment, & Professional Services Section
> Antitrust Division
> United States Department of Justice
> 450 5th Street, N.W., Suite 4000
> Washington, DC 20530

Under Section IX, the proposed Final Judgments provide that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgments.

## VI. Alternatives to the Proposed Final Judgment

The United States considered, as an alternative to the proposed Final Judgments, seeking injunctive relief against Defendants' conduct through a full trial on the merits. The United States is satisfied, however, that the relief sought in the proposed Final Judgments will terminate the anticompetitive conduct alleged in the Complaint and more quickly restore the benefits of competition to advertisers. Thus, the proposed Final Judgments would achieve the relief the United States might have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. Standard of Review Under the APPA for the Proposed Final Judgments

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the decree is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.

> The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5]

In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also U.S. Airways*, 38 F. Supp. 3d at 74-75 (noting that a court should not reject the proposed remedies because it believes others are preferable and that room must be made for the government to grant concessions in the negotiation process for settlements); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case"). The ultimate question is whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting United States v. Western Elec. Co*., 900 F.2d 283, 309 (D.C. Cir. 1990)). To meet this standard, the United

---

[5] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As a court in this district confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments,[6] Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that

---

[6] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15

"[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11. A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76. *See also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

---

U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

## VIII. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgments.

Dated: November 13, 2018

          Respectfully submitted,

          /s/ Lee F. Berger

          Lee F. Berger* (D.C. Bar #482435)
          Trial Attorney
          U.S. Department of Justice
          Antitrust Division
          Media, Entertainment, and Professional Services Section
          450 Fifth Street, N.W., Suite 4000
          Washington, DC 20530
          Phone: 202-598-2698
          Facsimile: 202-514-7308
          Email: Lee.Berger@usdoj.gov

          *Attorney of Record